UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**LEXINGTON**

ROBERT OLMSTEAD,                          )
                                          )
     Appellant,                     )
                                          )  Civil Action No. 5:04-549-JMH
v.                                        )
                                          )
BLUEGRASS STEAKS, INC. d/b/a              )  **MEMORANDUM OPINION AND ORDER**
WESTERN SIZZLIN STEAKHOUSE,               )
et al.,                                   )
                                          )
     Appellees.                     )

**\*\*    \*\*    \*\*    \*\*    \*\***

This matter is before the Court upon Plaintiff-Appellant Robert Olmstead's appeal the dismissal of Plaintiff-Appellant's amended complaint in an adversary proceeding [Adv. No. 96-5067] following a trial on the merits. Having been fully briefed, this matter is ripe for review. For the reasons that follow, the decision of the bankruptcy court is **AFFIRMED**.

### FACTUAL BACKGROUND

Specific factual disputes, the resolution of which are relevant to the issues before the Court on appeal of the bankruptcy court's order, are discussed in detail where relevant in this Memorandum Opinion and Order. Otherwise, the Court provides the following general factual background.

Debtor, Bluegrass Steaks, Inc. ("Bluegrass"), a Tennessee corporation, was formed in 1989 to acquire six Western Sizzlin' steakhouse restaurants owned by New Circle Steaks, Inc., a Kentucky corporation owned by Appellant Robert Olmstead ("Olmstead"). The

consideration for the transaction included $300,000.00 in cash, assumption of approximately $200,000.00 in accounts payable, and a $250,000.00 note.  At the time of purchase, Bluegrass's owners were David Wachtel ("Wachtel"), an 80% owner, and John Williams ("Williams"), a 20% owner.

Within a year of purchase, Bluegrass was forced to close two of the six restaurants while the other four restaurants still in operation were also unsuccessful.  As a result, on September 10, 1990, Bluegrass filed a petition in bankruptcy and, subsequently, filed a Plan of Reorganization (the "Plan") and Statement of Disclosure (the "Disclosure Statement") on February 28, 1991.  The bankruptcy court for the Eastern District of Kentucky confirmed the Plan on May 9, 1991.[1]

The Plan changed the nature of Bluegrass's business. Specifically, the Plan called for a conversion of one or more of the Western Sizzlin' restaurants to what the parties refer to as the "Logan's Concept."  Specifically, under the Plan, "Logan's w[ould] operate in the Debtor's Broadway, and eventually, New Circle Road locations via a [sic] agreement with Logan's Inc., a corporation owned and operated by Wachtel and David Toole, who

---

[1]Williams's minority interest in Bluegrass was extinguished in the reorganization.  Accordingly, during the time relevant to this cause of action and, particularly, to this appeal, Wachtel was the sole shareholder of Bluegrass.

currently manage the Debtor's operations."[2]  (Joint Exhibit ("JE")
2, Disclosure Statement at 7-8.)   In describing generally the
Logan's Concept, the Disclosure Statement declares, "Logan's has
been developed as an up-scale restaurant and will be presented to
the marketplace as a 'theme restaurant' with an emphasis placed on
the quality and preparation of product with a minimum serving of
entrees."  (*Id.*)   The Plan also called for Wachtel to loan
Bluegrass up to $300,000.00, "the proceeds of which w[ould] be used
to renovate the Broadway store and fund the remodeling and
renovation necessary to change to the new restaurant concept . . .
as well as working capital for the initial operations." (*Id.*)

The bankruptcy court's Memorandum Opinion clearly outlined the
bases for Olmstead's claims under the Plan.  The court explained as
follows:

> Plaintiff Olmstead's [individual] claim .
> . . is based on (1) his exposure as guarantor
> of the debtor's commercial loan from Bank of
> Lexington, (2) his exposure on restaurant site
> leases which the debtor assumed, and (3) the
> amounts due him under the Non-Competition
> Agreement and the Consulting Agreement
> executed by the debtor in connection with the
> purchase of the six Western Sizzling [sic]
> restaurants from New Circle Steaks, Inc.
> Separately, Mr. Olmstead was authorized
> to collect payments on a . . . note payable to
> New Circle Steaks, Inc. executed by the debtor
> in connection with the purchase of the six
> Western Sizzling [sic] steak houses from New

---

[2]The parties and the business documents admitted as exhibits
at trial also refer to the Broadway restaurant location as the
"Harrodsburg" location.

3

Circle Steaks, Inc. . . .

. . . .

Insofar as the court can determine from the record Mr. Olmstead never Expended Funds in satisfaction of the debtor's obligation to Bank of Lexington or to pay landlords on the leases of restaurant sites.

Consequently, the only surviving amounts of Mr. Olmstead's personal claim are the amounts owed to him under the Non-Competition Agreement and the Consulting Agreement, his Class G claim, and the amount he was authorized to collect on behalf of New Circle Steaks on its claim, which apparently it was the intent of the parties to treat as a Class G claim.

(Nov. 3, 2004 Memo. Op. at 28-29.)  In explaining how Olmstead's remaining individual claims and his claims on behalf of New Circle Steaks, Inc. were to be paid out, the Plan stated in relevant part:

The Class G Claim of Robert Olmstead shall be paid the sum of Fifteen Thousand Dollars ($15,000.00) within sixty (60) days following the Confirmation Date plus twenty-five percent (25%) of Net Income from the Debtor's operations calculated from the date of said payment for each year thereafter for a period of ten years (hereinafter the "Net Income Payment").  The Net Income Payment shall be paid to the Class G Claimant annually on each anniversary date of the initial $15,000.00 payment for a period of ten (10) years.

(JE 2, Plan at 8-9.)  Olmstead and New Circle Steaks, Inc. both cast ballots accepting the Plan prior to its May 9, 1991, confirmation.  (JE 24, 25.)

Before Bluegrass filed bankruptcy, Wachtel hired David Toole ("Toole") to manage the three Western Sizzlin' restaurants that

4

were located in Lexington.  According to Wachtel, he brought Toole in as an employee of Bluegrass to replace Williams who "wasn't getting the job done."  (Wachtel Depo. at 38.)  Wachtel testified that at the time he hired Toole, the decision had not yet been made to convert the restaurants to the Logan's Concept.  Though it is unclear what position Toole *formally* held immediately upon his hiring, the Disclosure Statement indicates that "[p]ost-petition, the Debtor's officers shall be Wachtel — President; David Toole — Vice President; and Greg Burns — Secretary/Treasurer subject to any amendment thereto by virtue of the actions of the Board of Directors."  (JE 2, Disclosure Statement at 12.)

In March of 1991, Wachtel formed Logan's, Inc.[3]  Wachtel was the president, sole director, and sole shareholder of the company. At some point after Toole's hiring,[4] Bluegrass entered into an undated License Agreement with Logan's, Inc.  Toole signed the License Agreement on behalf of Bluegrass, and Wachtel signed the License Agreement on behalf of Logan's, Inc.  Via the License Agreement, Logan's, Inc. — as Licensor — claimed "exclusive ownership of and right to" the Logan's Concept.  (JE 8 at 1.)  The

---

[3]The Court notes that the exhibits entered in this matter indicate the company name Logan's, Inc. both *with* a comma between the two words and *without* a comma.  Nonetheless, it is clear from the record in this matter that both versions refer to the same company.

[4]The bankruptcy court found that Toole signed the License Agreement no later than May of 1991.

License Agreement also granted to Bluegrass — as Licensee — "the exclusive right to operate an [sic] Logan's restaurant in accordance with the terms of th[e] license," at the Broadway/Harrodsburg Road location. (*Id.* at 2.) The License Agreement further provided that Bluegrass would pay to Logan's, Inc. a royalty equal to three percent of Bluegrass's gross sales.

The newly-converted Broadway restaurant, now called Logan's Roadhouse, opened in August of 1991. Sometime thereafter but before year's end, Wachtel hired Edwin W. (Ted) Moats ("Moats"), who had prior experience in the restaurant business, as a consultant. Bluegrass paid for Moats's consulting services. By May of 1992, the Broadway Logan's Roadhouse was generating exceptional sales. At some point following the opening of the restaurant, Wachtel, who also served as President and CEO of O'Charley's Inc. ("O'Charley's"), initiated discussions with the O'Charley's Board of Directors regarding a possible joint venture to expand the Logan's Concept. On June 1, 1992, O'Charley's issued a press release announcing that it had signed a letter of intent to form a partnership to purchase the existing Logan's restaurant and to develop five additional restaurants.

On August 10, 1992, Logan's Management Group, Inc. ("LMG"), successor to Logan's, Inc., entered into a Partnership Agreement with O'Charley's "for the purposes of owning, developing and managing Logan's Roadhouse restaurants." (JE 11 at 1.) On that

same day, Bluegrass entered into an Asset Purchase Agreement with the partnership between LMG and O'Charley's (the "Logan's Partnership") through which the Logan's Partnership purchased all of the assets of Bluegrass except the lease in the Broadway restaurant.  Bluegrass then sublet the Broadway restaurant to the Logan's Partnership, also in accordance with the Asset Purchase Agreement.  (JE 10.)  Through this transaction, Bluegrass for all practical purposes became the landlord of the Logan's Partnership with the rent that the Logan's Partnership paid being Bluegrass's only source of income.

## PROCEDURAL BACKGROUND

Olmstead originally filed the complaint in this adversary proceeding on July 19, 1996.  After Plaintiff voluntarily dismissed several of the Defendants in the original complaint, Plaintiff moved for leave to file an amended complaint.  Defendants also moved for summary judgment, and the bankruptcy court heard oral arguments on both motions on the same day.  Nearly sixteen (16) months later, the bankruptcy court denied both motions.

Wachtel then moved the court to dismiss him from the case and to dismiss certain claims altogether.  The court heard oral argument on the motion but did not rule at that time.  Over a month later, at a hearing on an unrelated issue, the bankruptcy court advised that it would require additional briefing before it ruled on Wachtel's pending motion, which the parties subsequently

7

provided.  Olmstead then filed a proposed first amended complaint and a supporting memorandum.

Because more than two years passed without a ruling on Wachtel's motion to dismiss, Olmstead filed a motion requesting that the bankruptcy court enter a new pre-trial order.  Before scheduled oral argument on the motion, the bankruptcy court entered an order *sua sponte* granting summary judgment in favor of Defendants as to Olmstead's fraudulent conveyance claim, striking Olmstead's proposed first amended complaint, and dismissing the adversary proceeding in its entirety.

Olmstead timely appealed the bankruptcy court's order, and this Court concluded (1) that genuine issues of material fact precluded summary judgment and (2) that the bankruptcy court erred in denying Olmstead leave to file a first amended complaint. Following remand, the bankruptcy court conducted a two-day trial beginning on August 20, 2003.  On November 3, 2004, the bankruptcy court entered its Memorandum Opinion and Order dismissing Olmstead's claims.  Olmstead timely filed this appeal.

### STANDARD OF REVIEW

A district court may reverse a bankruptcy court's findings of facts only where the findings are clearly erroneous. *Nicholson v. Isaacman*, 26 F.3d 629, 631 (6th Cir. 1994).  Moreover, the Sixth Circuit "has repeatedly observed that '[f]indings of fact anchored in credibility assessments are generally not subject to reversal

upon appellate review.'"  *United States v. Hudson*, 405 F.3d 425, 442 (6th Cir. 2005)(quoting *United States v. Taylor*, 956 F.2d 572, 576 (6th Cir. 1992)(en banc)).  A bankruptcy court's conclusions of law, on the other hand, are reviewed *de novo*.  *Id.*

## DISCUSSION

### A.  Factual Finding — Ownership of the Logan's Concept

Many of Plaintiff's claims, at least in part, turn on whether Bluegrass "owned" the Logan's Concept at the time of the alleged wrongful acts.  With respect to this issue, Olmstead argues that the bankruptcy court's factual finding that Bluegrass either did not develop, failed to assert its interest in, or transferred any right it may have had to the Logan's Concept was clearly erroneous.  First, Olmstead maintains that the bankruptcy court erred in concluding that Toole was not the "creator" of the Logan's Concept.  Moreover, Olmstead contends that the bankruptcy court erroneously believed that Olmstead's causes of action were grounded *solely* on Olmstead's argument that Toole was the sole creator of the Logan's Concept.  According to Olmstead, even if the bankruptcy court properly found that Toole was not the sole creator, the court could have, and should have, still found that Bluegrass owned the Logan's Concept.

The Court agrees with Olmstead that the bankruptcy court wrongly concluded that Olmstead's causes of action were grounded on the argument that Toole was the *sole* creator of the Logan's

9

Concept.  In other words, this Court finds that the bankruptcy court could have concluded that Toole was *not* the sole creator of the Logan's Concept and still have concluded that Bluegrass owned the Concept.  However, as described later in this Memorandum Opinion and Order, the Court finds that the bankruptcy court's conclusion that Bluegrass did not own the Logan's Concept during the relevant time period was not clearly erroneous.  Accordingly, this Court's disagreement with the bankruptcy court on whether Plaintiff's claims were grounded on Toole having been the sole creator is without consequence.

First, the Court finds that the bankruptcy court did not err in finding that Toole was not the sole creator of the Logan's Concept.  The Court emphasizes that its role as the reviewing Court is not to reweigh the evidence and determine the *best* factual conclusion based on the evidence as a whole.  Rather, the Court must accept the bankruptcy court's findings of fact, and the credibility determinations on which such findings are based, unless they are clearly erroneous.  *Nicholson*, 26 F.3d at 631.  The bankruptcy court's finding that Toole's testimony lacked credibility, regardless of whether this Court would have reached the same conclusion, is not clear error.  At times, especially when viewed in the context of all of the other evidence, Toole's testimony seemed questionable at best and outright unbelievable at worst.  In light of this, the bankruptcy court did not err in

concluding that Toole was not the sole creator of the Logan's Concept.

Moreover, the Court finds that the bankruptcy court did not err in concluding that Bluegrass did not own the Logan's Concept.[5] Ownership of a trademark, such as the Logan's Concept, depends upon "actual usage" of the mark "in the sale of goods or services" and not upon "invention" of the mark. J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 16:11 (4th ed.)(citing *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916)). McCarthy explains, "[R]ights in trademarks are not gained through discovery or invention of the mark, but only through actual usage."

---

[5]In his appellate brief, Olmstead addresses the issue of ownership in the following way: Did the bankruptcy court err in concluding that Bluegrass either did not develop, failed to assert, or gave up its interest in the Logan's Concept? The heart of Olmstead's question presented, however, is whether Bluegrass "owned" the Logan's Concept at the time of the relevant alleged wrongful acts. As Olmstead recognized, "If Bluegrass did not own the Logan's Concept[,] then Wachtel's taking it is irrelevant." (Appellant's Brief at 12-13.)

Although the bankruptcy court addressed and rejected, Olmstead's argument that Bluegrass developed and did not give up its interest in the Logan's Concept, the crux of the bankruptcy court's holding is that Bluegrass was not the first to market the Logan's Concept and, accordingly, did not own the Logan's Concept. If, as the bankruptcy court has stated, ownership is determined by "use" of the Logan's Concept, then answering the question of whether Bluegrass developed or gave up its interest in the Logan's Concept is not only unnecessary, but fails to address the *actual* issue before the Court. Accordingly, the Court will first determine whether the bankruptcy court was correct in finding that "ownership" depends on who first marketed the Logan's Concept to the public and, if so, whether Bluegrass or Logan's, Inc. first "used" the Logan's Concept.

*Id.* (citing *G. & C. Merriam Co. v. Saalfield*, 198 F. 369 (6th Cir. 1912)).

Olmstead's brief contains little to no argument that Bluegrass was the first entity to use the Logan's Concept. In fact, the only reference contained in Olmstead's brief is a conclusory statement that "Bluegrass — not Logan's Inc. — first marketed the [Logan's] concept to the public." (Appellant's Brief at 13.) The Court agrees with the bankruptcy court that trademark law seems to indicate that ownership is determined by use.[6]

Applying this law to the facts of the case, the Court finds that the bankruptcy court did not err in concluding that Logan's,

---

[6]The Court recognizes Olmstead's argument that Bluegrass could assert a claim to the Logan's Concept only if Wachtel caused Bluegrass to do so. In fact, this Court utilized such reasoning upon examination of the bankruptcy court's original opinion in this matter. The Court stated:

> The bankruptcy court also found that Bluegrass never claimed ownership of the Logan's Concept. This somewhat misses the point, however; it ignores the fact that Wachtel was in control — at that time Wachtel was the sole shareholder and President of Bluegrass as well as the President, sole director, and sole shareholder of Logan's, Inc. Bluegrass could act to assert a claim to the Logan's Concept only if Wachtel caused it to act.

(Feb. 7, 2003 Memo. Op. and Order at 19.) However, the law is what it is, and this Court is bound by it. Upon further review of the law applicable to this case, the Court finds that ownership is governed by "use" of the mark. Accordingly, the fact that Wachtel could have acted on behalf of either Bluegrass or Logan's, Inc. for the purpose of "claiming" the Logan's Concept is without consequence.

12

Inc., and not Bluegrass, was the first to use the Logan's Concept. In fact, Olmstead has failed to identify, and the Court is unaware of, any facts on which this Court could conclude that Bluegrass was the first to use the Logan's Concept. By the time the Logan's Concept was being used, Bluegrass and Logan's, Inc. had already entered into the License Agreement, which rendered Bluegrass a licensee and Logan's, Inc. a licensor.

On the other hand, Olmstead suggests that the License Agreement entered into in May of 1991[7] was a "sham" transaction that must be voided under bankruptcy law. However, this argument was not presented at any point in these proceedings until the *second* appeal of this case. "It is well-settled that this [C]ourt will not consider arguments raised for the first time on appeal unless our failure to consider the issue will result in a plain miscarriage of justice." *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 143 (6th Cir. 1997). The Court recognizes "that this matter is 'left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.'" *Pinney Dock & Transp. Co. v. Penn. Centr. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988)(quoting *Singleton v. Wulff*, 428 U.S. 106, 121 (1976)). Finding that Olmstead could have argued this at the trial

---

[7]Olmstead does not appear to contest the bankruptcy court's finding that Toole signed the License Agreement in or before May of 1991. Nonetheless, a thorough reading of all of the evidence in this case yields the conclusion that it was not clear error for the bankruptcy court to find as such.

court level and that failure to consider this argument will not
result in a "plain miscarriage of justice," the Court declines to
exercise its discretion to consider the new argument on appeal.
*Bailey*, 106 F.3d at 143.

Accordingly, to the extent that Olmstead's claims are based on
Bluegrass's ownership of the Logan's Concept, the Court affirms the
bankruptcy court's dismissal of such claims.

**B.    Res Judicata — Effect of Confirmation of the Plan**

Sixth Circuit authority makes it clear that "[a]s a general
rule, the '[c]onfirmation of a plan of reorganization constitutes
a final judgment in bankruptcy proceedings.'"   *Browning v. Levy*,
283 F.3d 761, 772 (6th Cir. 2002)(quoting *Sanders Confectionery
Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 480 (6th Cir.
1992)).   Specifically, "[c]onfirmation of a plan of reorganization
by the bankruptcy court has the effect of a judgment by the
district court and res judicata principles bar relitigation of any
issues raised or that could have been raised in the confirmation
proceedings."   *Still v. Rossville Bank* (*In re Chattanooga Wholesale
Antiques, Inc.*), 930 F.2d 458, 463 (6th Cir. 1991).

As this authority indicates, the bankruptcy court clearly did
not err in its conclusion that a confirmation plan *may* have res
judicata effect.   Thus, the question before this Court is whether
the bankruptcy court erred in concluding that Olmstead *could have
raised* concerns about the Plan and the Disclosure Statement prior

14

to confirmation, thereby precluding Olmstead's claims, including breach of fiduciary duty and interference with contract.   This Court finds that the bankruptcy court did not err in concluding as such.

Olmstead argues that "Wachtel engaged in a scheme of tricks or contrivances that were intended, as a matter of law, to exclude suspicion and prevent inquiry" and, as such, Olmstead *could not have raised* the issues prior to confirmation of the Plan. Specifically, Olmstead argues (1) that the Plan and Disclosure Statement indicated that Bluegrass would be "converted" to operate under the Logan's Concept, which is different than what actually happened; (2) that the Plan and Disclosure Statement represented that Bluegrass's operations would continue; (3) that the Plan and Disclosure Statement spell out a management relationship between Bluegrass and Logan's, Inc.; and (4) that Wachtel provided false financial statements to Olmstead.

Regarding Olmstead's first argument, the Court finds that the description in the Plan and Disclosure Statement is not inconsistent with what actually occurred.   Thus, the language in both documents does not necessarily yield the conclusion that Wachtel intended to deceive Olmstead.   Olmstead's second argument is not entirely accurate.   The Plan states, "[u]pon confirmation, the Debtor's business shall be operated pursuant to an agreement with Logan's, Inc."   (JE 2, Plan at 13.)   The Disclosure Statement

15

likewise states that "Logan's will operate in the Debtor's Broadway, and eventually, New Circle Road locations via a [sic] agreement with Logan's Inc., a corporation owned and operated by Wachtel and David Toole, who currently manage the Debtor's operations." (JE 2, Disclosure Statement at 7-8.) Neither of these statements indicates that Bluegrass will continue to operate as a *restaurant*. Rather, the Plan and Disclosure Statement make clear that *Logan's* will operate in Bluegrass's Broadway location via an *agreement* between Bluegrass and Logan's, Inc. Regardless of whether the Plan and Disclosure Statement are vague with respect to the details of the "agreement," this Court will not make the leap that Olmstead suggests — that such vagueness indicates that Wachtel intended to deceive Olmstead — especially absent such a finding by the bankruptcy court. Such vagueness certainly did not *prevent* Olmstead from inquiring into the details of the "agreement"; instead, it should have prompted him to do so.

Olmstead's next argument, that the Plan and Disclosure Statement spell out a *management* agreement between Logan's, Inc. and Bluegrass is entirely contrary to the bankruptcy court's finding of fact on that issue. Rather, the bankruptcy court found that Olmstead could not have reasonably believed that the Logan's in the Broadway location was being operated under a management agreement rather than a franchise agreement. The court specifically found:

> There is simply no evidence of an intent on
> the part of the defendants Bluegrass Steaks
> and Wachtel to mislead plaintiff Olmstead by
> referring in the note to Exhibit 1-A to the
> Disclosure Statement to payments to Logan's,
> Inc. as management fees. Plaintiff Olmstead's
> lack of knowledge of the nature of the Logan's
> License Agreement is due to his failure to
> timely pursue inquiry concerning the
> agreement.

(Nov. 3, 2004 Memo. Op. at 26.)

Again, the Court finds that the bankruptcy court's finding of
fact on this issue was not clearly erroneous. As the bankruptcy
court properly concluded, it would be nonsensical for the
"franchise fees" referred to in Exhibit 1-A to represent fees paid
to Western Sizzlin' because the Plan called for "cessation of the
Debtor's business operations as a Western Sizzlin and a conversion
to a new concept." (JE 2, Disclosure Statement at 6.) The
bankruptcy court's finding of fact is further supported by Western
Sizzlin's motion, filed by counsel for Western Sizzlin' many months
before confirmation of the Plan and served on counsel for Olmstead,
seeking an Order requiring Bluegrass to discontinue use of the
Western Sizzlin' mark. Additionally, the Plan itself stated that
Bluegrass would execute an agreed order sustaining Western
Sizzlin's motion. It is beyond reason that Bluegrass would pay
franchise fees to Western Sizzlin' despite Bluegrass's inability to
use the Western Sizzlin' mark. This, at the very least, put
Olmstead on notice — or should have put Olmstead on notice — that
the "franchise fees" noted in Exhibit 1-A were being paid to

17

someone *other* than Western Sizzlin'.   As such, the bankruptcy court's finding of fact in that regard is not clearly erroneous.

Olmstead's final argument is that Wachtel admitted having provided Olmstead with misleading financial statements.   The relevant testimony proceeded as follows:

> When Mr. Olmstead elected not to participate in the overall plan, I had a commitment to him to pay him 25 percent of the profit of the Lexington store for a period of ten years based on GAP as per the plan for expenses that had previously been incurred.  When we folded the company in, I caused this statement to be developed every quarter for reporting purposes to Mr. Olmstead to reflect this store as if it had been operating as an independent store as it was prior to the deal.

(Wachtel Depo. at 61-62.)   Olmstead's interpretation of this testimony is not the only logical and, arguably not the *most* logical, interpretation.   The testimony suggests that Wachtel believed that, despite Olmstead's refusal to participate in the joint venture, Olmstead was still entitled to 25% of the net profits of the Broadway store.   Because of that — and not to prevent Olmstead from discovering the reality of the franchise agreement between Bluegrass and Logan's, Inc. — Wachtel provided Olmstead with quarterly statements showing the profit of the Broadway store only.[8]

_____

[8]The Court is not making a finding of fact in this regard. Rather, the Court discusses this logical interpretation merely to emphasize that the bankruptcy court had sufficient reason to reject Olmstead's arguments that Wachtel acted with intent to deceive.

In sum, Olmstead's arguments are all premised on the requirement that this Court *reject* the evidence as interpreted by the bankruptcy court — a step that this Court is unwilling to take. The Court finds that the bankruptcy court's findings of fact are not clearly erroneous — regardless of whether this Court would have reached the same findings or whether there are other logical interpretations of the evidence. There was sufficient evidence on which the bankruptcy court could conclude that Wachtel had not acted with intent to deceive and, accordingly, that Wachtel did not prevent Olmstead from raising the issues contained in his complaint prior to confirmation of the Plan.

Moreover, and more importantly, the bankruptcy court appropriately concluded that Olmstead failed to seek clarification of provisions of the Plan — provisions that Olmstead now directly attacks. This Court agrees that "Olmstead's alleged confusion with respect to the 'agreement' between the debtor and Logan's, Inc. could have and should have been raised in connection with the confirmation of the Plan." (Nov. 3, 2004 Memo. Op. at 27.) Accordingly, Olmstead's claims are barred by the doctrine of res judicata.

**C.    Breach of Fiduciary Duty and Interference With Contract Claims**

Despite the bankruptcy court's finding that the doctrine of res judicata barred Olmstead's claims, the bankruptcy court went on to discuss the merits of Olmstead's claims. Having found that the

bankruptcy court did not err in its res judicata holding, however, this Court need not address the merits of these claims further.

<strong>CONCLUSION</strong>

For the foregoing reasons, the decision of the bankruptcy court is **AFFIRMED**.

This the 23rd day of June, 2005.



Signed By:

_**Joseph M. Hood**_

**United States District Judge**